

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-04-00173-CR
_____


STEPHON WALTER, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 5th Judicial District Court
Bowie County, Texas
Trial Court No. 03F0757-005



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

In this triple-murder case, remanded from the Texas Court of Criminal Appeals, we are called on to assess harm to Stephon Walter from the erroneous admission of blame-shifting hearsay testimony. Central here are co-defendant Richard Markel Henson's hearsay statements to his brother Roderick Henson[1] about what Walter did at the time and place of the killings in question. At trial, they were admitted as statements against Henson's interest under Rule 803(24) of the Texas Rules of Evidence. *See* TEX. R. EVID. 803(24). We affirmed. The Texas Court of Criminal Appeals reversed, finding that some of Henson's statements, those that were "blame-shifting," were erroneously admitted. The case has been remanded to us for a harm analysis. *See Walter v. State*, 267 S.W.3d 883, 900 (Tex. Crim. App. 2008). Because, as explained below, we find the error harmless, we affirm the judgment of the trial court.

In making its ruling in this case, the Texas Court of Criminal Appeals distinguished among three different types of statements against interest. Purely self-inculpatory statements are those in which the speaker admits to having done an act himself or herself. A blame-sharing statement is one in which the speaker admits that "we" did an act. The blame-shifting statement is one that points the finger of blame away from the speaker, e.g., "I was there, but Joe pulled the trigger." The high court formally adopted this rule:

---

[1]In this opinion, we refer to Richard Henson as "Henson" and Roderick Henson as "Roderick."

> Both statements that are directly against the declarant's interest and collateral "blame-sharing" statements may be admissible under Rule 803(24), if corroborating circumstances clearly indicate their trustworthiness. "Blame-shifting" statements that minimize the speaker's culpability are not, absent extraordinary circumstances, admissible under the rule.

*Id.* at 896. "The rule requires courts to separate the dross of blame-shifting statements from the gold of self-inculpatory and blame-sharing statements, admitting only the latter." *Id.* at 886.

A two-step foundation requirement is set out in Rule 803(24) of the Texas Rules of Evidence. *Id.* at 890. First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability and whether the declarant realized such when he or she made the statement. *Id.* at 890–91. Second, the trial court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement. *Id.* at 891.

The bulk of Roderick's testimony is admissible as it recounts Henson's statements against his own penal interest. The inadmissible portions of the testimony concern certain "blame-shifting" statements, those in which Henson attempts to portray Walter as the more culpable party.

The erroneously admitted hearsay statements of Henson recounted that, as Henson stood outside holding the money just taken from inside the Outback Steakhouse, Walter went back inside a back room of the restaurant, from which Henson heard the three Outback employees, Matthew Hines, Rebecca Shifflett, and Crystal Willis, pleading for their lives, followed by the sounds of six

gunshots. That is visceral, memorable evidence. The question is whether the admission of such evidence is harmful in light of this record.

According to Walter, the erroneous admission of hearsay testimony that included an account of these sounds was harmful. While the erroneously admitted evidence is emotionally powerful, this whole case is, by its nature, emotionally charged. The record contains much other evidence, including Walter's admissions to his own family about his involvement, ballistics evidence tying Walter to the murders, and a number of other witnesses recounting events surrounding the three murders.

In performing our harm analysis, we consider the nature of the inadmissible evidence, the context of the entire trial, and the remaining evidence.

*(1)* *Relevant Portions of Roderick's Testimony*

Roderick testified at trial that Henson told him about the events of August 31 at the Outback Steakhouse. Roderick was familiar with Walter and testified that Henson and Walter were acquaintances. Roderick further testified that, the morning following the murders, a nervous Henson told him about the events. Before Roderick heard anything about the murders, Henson told him that Walter and Henson had planned on "hit[ting] a lick," slang for committing a robbery, at the Outback. Henson explained to Roderick in their private conversation that Walter went into the back office, came out with a bag of money, and went back to the office to perhaps get keys to the safe. As Henson waited in the hallway, he heard voices pleading with Walter not to shoot, and then heard six

4

gunshots. Henson and Walter left in Walter's vehicle and split the money, amounting to approximately $400.00 each.

Fearing that a security camera might have filmed Henson and Walter leaving the Outback, Henson enlisted Roderick's help in burning the clothing Henson wore that night. Roderick suggested to Henson that he turn himself in and, after Roderick began fearing that he was becoming too involved himself or after he learned of the reward offered in connection with the murders, had his wife call the police and relay the information he had learned from Henson. Walter objected to Roderick's testimony as hearsay.

*(2)* *Inadmissible Portions of Roderick's Testimony*

The trial court was "obligated to parse a generally self-inculpatory narrative and weed out those specific statements that are self-exculpatory or shift blame to another." *Id.* at 897. The controlling question in the parsing is this: "How much dross may accompany the gold of the purely self-inculpatory statements?" *Id.* Here, the trial court erred by admitting "those particular statements by Henson that shifted blame to [Walter]."[2] *Id.* at 900.

---

[2]The State unsuccessfully attempted to take Henson's statements to Roderick out of the realm of "blame-shifting" by contending that, since Henson made the statements to his brother rather than to a police officer, he would not have the motive to shift blame. *Walter*, 267 S.W.3d at 898. The Texas Court of Criminal Appeals disagreed, explaining that, indeed, he would have such motive since he was enlisting the help of his disapproving brother. *Id.* The State also argued that the statements were inherently reliable because, essentially, Henson talked himself into capital murder liability. The court expressed doubt, however, as to whether Henson knew, at the time of his statements to Roderick, that such statements would make him liable for capital murder. *Id.* at 898–99.

The court concluded that the trial court abused its discretion by admitting Henson's narrative

5

Specifically, admission of the following portions of Roderick's testimony was error as blame-shifting statements: (1) Henson waited in the hallway as Walter returned to the office, (2) Henson heard voices pleading with Walter not to shoot them, and (3) Henson heard six gunshots as he waited in the hallway. The task now at hand for this Court is to determine whether admission of these particular portions of Roderick's testimony, the dross, was harmful error under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(b).

*(3)     Assessing Harm*

　　*(a)     Standard of Review*

An appellate court must disregard nonconstitutional error that does not affect a criminal defendant's "substantial rights." *Id.*; *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Under Rule 44.2(b), we may not reverse for nonconstitutional error if we, after examining the record as a whole, have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey*, 215 S.W.3d at 885; *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (noting adoption of federal nonconstitutional error standard as explained in *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)).

In making this determination, we should consider the entire record, including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire if applicable. *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App.

---

in its entirety without examining each fact asserted in the narrative to assess whether that fact was directly self-incriminating or, at a minimum, shared blame equally with Walter.

6

2003); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).  Important considerations are "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla*, 78 S.W.3d at 355.  We should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert.  *Id.* at 356.

      *(b)*      *Nature of Erroneously Admitted Evidence*

The inadmissible evidence is dramatic.  The idea of three people unsuccessfully begging for their lives is not an easy one to forget.  This certainly could suggest harm.  We learn from *Prible v. State*, 175 S.W.3d 724, 737 (Tex. Crim. App. 2005), however, that the impact of other, properly admitted, evidence should be considered in our harm analysis.

At issue in *Prible* was the admission of photographic evidence depicting dissected organs taken during the autopsies of children killed by smoke inhalation during a fire set by the defendant in an attempt to hide the murders of the children's parents.  *Id.* at 735.  The Texas Court of Criminal Appeals concluded that the admission of those photographs was error since the State had alleged that Prible had caused the death of the parents, not the children, and since the children's cause of death was not at issue.  *Id.* at 736.  Further, there was sufficient corroboration of witness testimony elsewhere in the record, including crime scene photographs and more general photographs of the children's autopsies.  *Id.*  Therefore, the trial court had abused its discretion by admitting the photographs of the children's organs over Prible's Rule 403 objection.  *Id.*; *see* TEX. R. EVID. 403.

7

The *Prible* court went on to analyze this error for harm. In doing so, it considered that "the jury had already seen and heard about the disturbing circumstances of the children's deaths through properly admitted photographs and testimony." *Prible*, 175 S.W.3d at 737. Though, unlike the case at hand, the evidence was characterized as "clinical" and "not particularly emotionally charged," the court went on to evaluate harm by examining the impact of other properly admitted evidence, including other, more graphic photographic evidence. *Id.* (stating that improperly admitted photographs "pale in comparison to the properly admitted post-mortem photographs of [the alleged victims]").

Here, as stated, we have emotionally charged, improperly admitted evidence. We also have in the record a wealth of other emotionally charged evidence, the probable impact of which we can consider in determining whether admission of the inadmissible testimony was harmful. We have the tearful testimony from a young widow whose concern for her husband led to the discovery of the murders, photographs of the victims at the crime scene, including photographs depicting a young pregnant Shifflett who had apparently been executed as she cowered near the wall in an attempt to seek refuge behind a desk, and testimony from Walter's own family members (including his distressed mother) concerning the events leading up to and following the murders. The emotional impact of the improperly admitted portions of Roderick's testimony is diminished to a degree when placed in the context of a trial filled with other highly emotionally charged evidence. The harm from

8

the probative value, too, is diminished by the probative value of the other, properly admitted, evidence of guilt.

### (c)     Use of the Inadmissible Evidence

Further, although the testimony itself was not lengthy, the State did mention portions of the testimony three times in closing arguments, specifically referring to the three people pleading for their lives. While the State did not focus on this entirely, it did reiterate the dramatic imagery of the inadmissible portions of Roderick's testimony. This, too, would lend itself to a finding of harm.

### (d)     Inadmissible Evidence in Context of Entire Record

Nevertheless, it is important to place this erroneously admitted evidence in the context of the other evidence presented at trial. Here, the record does two things. First, it provides us with a good deal of evidence that specifically corroborates Roderick's testimony and Walter's role as shooter.[3] Second, it provides ample evidence that Walter, at a minimum, participated in the robbery. With that evidence, evidence that three people were murdered during the course of the robbery, and evidence strongly suggesting that the only people present at the Outback Steakhouse at the time of the murders were the three victims and the two robbers, Walter and Henson, the law of parties would apply to make Walter liable for capital murder, no matter his specific role in the act.

---

[3]The Texas Court of Criminal Appeals specifically mentioned the use of independent corroboration of inadmissible facts in analyzing harm. *See Walter*, 267 S.W.3d at 900 n.73.

9

*(i)* *Evidence that Corroborates Roderick's Testimony, Walter's Role as Shooter*

The State produced pictures of the barbeque pit in which Henson and Roderick burned the clothing worn during the robbery/murders. The State also introduced pictures of the money recovered in an amount and in a location consistent with Henson's account of the robbery and murders.

Billy Ray Johnson is the boyfriend of Walter's sister, Torian Hill. Johnson testified that Walter had come over to his and Torian's residence during the daylight hours of August 31. While there, sometime between noon and one o'clock, Walter asked him for a gun, offering as his justification that he was living in a high crime area and wanted it for personal protection. Johnson gave Walter a .380 caliber semi-automatic Lorcin.[4] When Walter returned later that day, he mentioned to Johnson that Walter should "do Outback." Johnson did not take the statement seriously at the time. It was only when Walter mentioned it again later that day that Johnson suggested Walter give the gun back to him.

Digging deeper into the record, we learn that, somewhere between 1:00 and 2:00 a.m. September 1, Walter returned to Johnson's residence and explained to Johnson that he had robbed and killed someone at the Outback Steakhouse and that three had been killed there. He was scared

---

[4]During his trial testimony, Johnson was questioned regarding his substantial criminal history, including a 1985 sexual assault conviction, a 1992 drug-related conviction, and a 1992 possession of a firearm as a felon conviction. However, the trial court did not allow Walter's counsel to go into Johnson's 1988 convictions for second-degree murder and aggravated robbery, concluding that such evidence was more prejudicial than probative.

that Henson might tell someone about it, to which Johnson said that Walter should have killed Henson, too. Walter begged Johnson not to tell Torian about the events. Ultimately, after Walter was arrested in connection with the murders, Johnson ended up telling both Walter's mother and sister about this conversation.

He testified that he accompanied Walter's mother to Walter's apartment after Walter's arrest to get his valuables out so that people in the neighborhood would not take Walter's publicized incarceration as an opportunity to steal his belongings. Apparently, theft of an arrestee's goods has happened before in this neighborhood. Johnson testified that the gun Walter's mother found at Walter's apartment was the same gun he had given Walter August 31. He confirmed the mother's account of cutting up the gun and disposing of its pieces along the highway to Domino, Texas. He testified about his discussion with Walter about creating an alibi and confirmed that he let Walter know they had found the gun and had "taken care of everything." Johnson assured Walter by telephone that the gun was removed before authorities had searched the apartment.

Delinda Roever is Walter's mother and learned of Walter's involvement from Johnson on the day Walter was arrested. She testified about the several trips she made to clear things out of Walter's apartment. While she explained that they were careful to have moved stuff out after all police searches were conducted, Johnson's testimony seems to contradict that time line. She testified that, on one trip they made to the apartment, she lifted a large painting off the wall and a gun fell from behind it. She instantly believed it to be the gun used in the murders. The two hid it in a laundry

11

basket and left with it. After failed attempts to melt it down over a stove burner and to break it up with a hammer, the two bought a grinder and cut it into pieces. She knew it was a crime to do that, but wanted to help her son. She explained that, as she and Johnson drove along the highway to Domino, Texas, she threw pieces of the gun out along the way. She stuck the last larger piece in a soiled diaper she found in a dumpster at an apartment complex.

She testified that, in a telephone conversation with Walter from jail, he admitted to her that he was the "mastermind" behind the crime. She reiterated that she learned of his involvement from Johnson. She acknowledged that Johnson identified the gun as the one he had given to Walter.

Investigator Steve Shelley testified that an unfired cartridge was found at Walter's apartment. Also, according to Shelley, the number of shots fired at the Outback Steakhouse was never released to the public. This fact corroborates to some degree the inadmissible portion of Roderick's testimony that Henson told him he heard six shots. Shelley also testified about the conversations recorded between an incarcerated Walter and his family members as they attempted to formulate an alibi and in which Walter made statements of regret.

Although the firearm used in the commission of the murders was never recovered, in pieces or otherwise, the record does contain significant ballistics evidence. Laura Fleming is a ballistics expert and testified, first, that general, class characteristics were consistent with the conclusion that all the recovered spent casings were fired from a .380 caliber Lorcin. Fleming went further into her

findings, revealing that her comparison of the extractor marks[5] on the unspent cartridge found at Walter's apartment and casings recovered at the crime scene led her to conclude that the unspent cartridge from Walter's apartment was, at some point, chambered in the very same gun from which, at least,[6] three of the recovered spent casings were extracted at the crime scene. That is, she testified "there's no doubt" that the cartridge from Walter's apartment was loaded in and removed from the very same gun that was fired, at least, three times at the Outback Steakhouse. She also testified that her examination of all the bullets and bullet fragments recovered from the scene and the bodies revealed that all the recovered bullets were fired from the same gun, suggesting that only one gun was used at the scene. We know from the extractor marks that the murder weapon also housed the unspent cartridge found at Walter's apartment.

### (ii)    Evidence Establishing Walter as a Participant

Brittany McCormack was dating Henson at the time and worked with him that night at a fast food restaurant. She testified that Walter came by right after closing time, tapped on the window,

---

[5]An extractor, as Fleming explained, is a metal, generally hook-shaped component within a firearm that is used to withdraw or extract a cartridge or cartridge case from the chamber of a firearm.

[6]To clarify, Fleming explained that her examination revealed that four of the six recovered casings came from the same firearm. Of those four casings, three were conclusively connected to the unspent cartridge from Walter's apartment. Her examination of the other two casings was inconclusive; she found that those two were fired from the same gun as one another, but could not find sufficient individual characteristics to conclude that those two came from the same gun as the other four casings or the unspent cartridge from the apartment. The results of her examination were inconclusive as to those two casings, meaning that they could not be identified or eliminated as having been chambered in the very same gun from which the unspent cartridge was extracted.

13

and asked for Henson. The two had a short conversation. Henson, McCormack, and another co-worker left work, with Henson driving McCormack's car. The three went to Griff King Courts (where Johnson and Walter's sister lived) where Henson got out and the girls stayed in the car. Henson was getting marihuana from Johnson.

McCormack then explains that she and Henson went to the house of Henson's sister, where Henson was living as well. She and Henson were watching a movie when Walter showed up at the house at, she estimates, around 11:00 p.m. She noted that he was wearing gloves and was "anxious" and "jittery." Walter and Henson went in Henson's bedroom. Walter left, and Henson followed shortly after him. McCormack did not see them get into the same car, but did note that her car, the one she and Henson had taken to the house, remained in the parking lot. McCormack finished watching the movie and left for her apartment. Between 2:00 and 3:00 a.m., Walter called her and asked her to pick him up from his sister's house.

Richanda Henson, Henson's sister, has known Walter since childhood. She testified that Henson arrived at their residence between 10:00 and 11:00 p.m., though probably closer to 11:00 p.m. She also noticed that Walter was wearing gloves and joked about him looking as though he was going to rob someone. Her testimony is consistent with McCormack's to the effect that Walter and Henson went to the back bedroom, the one being used by Henson, and then they left somewhere between 11:00 and 12:00. She described her brother's demeanor the next morning as "distant" and "reserved."

14

Lawshawnda Clark was one of Walter's sexual partners and had let him stay at her home in nearby Hope, Arkansas, where the two of them were working at a chicken factory. She testified that, on Saturday, August 30, Walter left Hope at about 9:00 p.m. to go to his sister's party in Texarkana. She did not see Walter again until Monday, September 1, at approximately 2:00 a.m.

Torian Hill is Walter's sister and Johnson's girlfriend. She had an alcohol and marihuana party August 31. She explained that Henson had come by to talk to Johnson; she thinks he came to get marihuana from Johnson. We learn from Johnson that he had given Henson marihuana in exchange for food. It was while Henson was there that Walter came by the party the first of about three times that night/morning.

Hill explained that, on the day Walter was arrested, she learned from Johnson of Walter's involvement in the murders. She testified about the efforts that were made by telephone to try to set up an alibi for Walter. The alibi was to include the fact that she had to pick him up because he had run out of gas. Walter would later testify that he wanted to add that fact to the events of the night so the police would believe him and think that he was with his sister. Hill was jailed for perjury after having told some version of the fabricated story to the grand jury.

Walter testified in his own defense. He admitted to going by Henson's workplace on the night of August 31 to see Henson. He explained though that he just wanted to invite him over to his apartment to watch movies. The two planned to do just that and also move some tires from Walter's apartment. Walter left to deliver some ice cream from the fast food restaurant to Henson's sister.

15

He admitted having gone to Johnson to get a gun, but maintains it was at Henson's request so that Henson could rob the Outback Steakhouse. He explained that Henson invited him to come along, but Walter declined on the advice of Johnson who, Walter claimed, wanted a cut of the money as "rent" for the gun.

Walter also admitted to having worn gloves that night, but explains that he was working on his overheating vehicle throughout the night and did not want to mess up his nice clothes. Additionally, he maintained, the gloves were useful in moving tires. He admitted to having worn these gloves to Henson's sister's house; he does not specifically explain why he did so, though. He was just trying to be helpful to Henson when he gave Henson the gun with the understanding that it would be used in the robbery. Henson did not have a vehicle and, so, he left Walter's apartment with the gun and on foot. Walter testified that he left his apartment shortly thereafter to return to Hope, but ran out of gas. He walked to his sister's to borrow a vehicle to get gas, did so, returned the keys, filled up his tank, and returned to Hope. He denied being at the Outback Steakhouse that night and explained that he was only trying to get the police to believe him by lying about his sister picking him up that night. Essentially, any witness who testified to anything negative about him, work-related or crime-related, was lying about him. He explained that his mother must have misinterpreted his statement about being the mastermind of the crime. Forced to acknowledge that an unspent cartridge was found in his apartment that a ballistics examination showed had been chambered in the very gun that was used in the murders at the Outback Steakhouse (and that his

16

mother and Johnson later found in his apartment and destroyed), Walter could say only that it was a coincidence.

Despite Walter's denial of any involvement in the actual robbery[7] and murders, the record is replete with evidence that would support a finding that Walter was, in fact, involved. At a minimum, the evidence is quite strong that Walter was one of the two perpetrators of the robbery during which Hines, Shifflett, and Willis were killed. The law of parties would thus make Walter liable for capital murder, regardless of his precise role in the shootings.[8] *See* TEX. PENAL CODE ANN. § 7.02(b).

---

[7]It is at least conceivable that, by admittedly providing the gun and admittedly knowing at the time he did so that the gun would be used in the robbery, Walter may have still subjected himself to some amount of criminal liability in the events.

[8]Section 7.02 of the Texas Penal Code imposes criminal responsibility as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*See* TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003). Standing alone, proof that an accused was present at the scene of the crime or assisted the primary actor in making his or her getaway is insufficient. *Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.—Fort Worth 2003, pet. ref'd); *Scott v. State*, 946 S.W.2d 166, 168 (Tex. App.—Austin 1997, pet. ref'd). The evidence must show that, at the time of the offense, the parties were acting together, each contributing some part toward the execution of their common purpose. *Brooks v. State*, 580 S.W.2d 825, 831 (Tex. Crim. App. [Panel Op.] 1979); *Wooden*, 101 S.W.3d at 546. Evidence is legally sufficient to convict under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement. *Wooden*, 101 S.W.3d at 546. Whether an accused participated as a party to an offense may be determined by examining the events occurring before, during, and after the commission of the offense and by the actions of the accused which show an understanding and common design to commit the offense. *Beier v. State*, 687 S.W.2d 2, 4 (Tex.

17

*(4)      Error Was Harmless*

A review of the entire record reveals a good deal of other evidence to support Walter's role as the shooter in the robbery and murders. Even more evidence supports more generally his participation in the robbery, which would likely support a capital-murder conviction, at any rate. Most importantly, that Walter was the shooter is supported by "gold-standard" statements. That is, Walter told his brother-in-law that he robbed the Outback Steakhouse and killed someone. He even admitted to his own mother that he was the mastermind behind at least the robbery during which the killings occurred. These statements were certainly self-inculpatory. So, although the State placed a fair amount of emphasis on the inadmissible portions of the testimony, the volume and nature of the evidence supporting the verdict suggest to us that the erroneous admission of the blame-shifting "admissions" was harmless.

After examining the record of Walter's trial as a whole, we conclude that it provides fair

---

Crim. App. 1985); *Wooden*, 101 S.W.3d at 546.

assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict.  We affirm the judgment of the trial court.


                                        Josh R. Morriss, III
                                        Chief Justice

Date Submitted:        May 13, 2009
Date Decided:          August 11, 2009

Publish