

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00245-CR

_____

ADAN CHAVEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CR2023-0003

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Despite Appellant Adan Chavez's not-guilty plea, a jury found that he had intentionally or knowingly caused the death of Jorge Gonzalez[1] by shooting him with a firearm[2] and then assessed his punishment at life imprisonment. *See* Tex. Penal Code § 19.02(b)(1), (c). Adan does not challenge the sufficiency of the evidence to support his conviction. Instead, in two issues, he complains that the trial court abused its discretion when it overruled his hearsay objection to State's Exhibit 213 and caused him egregious harm by failing to sua sponte charge the jury on the accomplice–witness rule. Because the record reflects no abuse of discretion or egregious harm, we affirm the trial court's judgment.

---

[1]Because Jorge's brother Raul testified at trial, we will refer to the Gonzalezes by their first names. For consistency in the narrative, we will also refer to the appellant by his first name and some of the witnesses by their nicknames.

[2]As summarized in Adan's bail-reduction appeal (and as supported by the instant appeal's record), Adan shot Jorge in front of a Dollar Saver store in the last of their series of confrontations that day. *Chavez v. State*, 671 S.W.3d 775, 779 (Tex. App.—Fort Worth 2023, no pet.). In that final confrontation, "[Adan] proceeded to get out of the truck he was in[,] . . . pulled a rifle out of a cooler in the truck's bed, . . . pulled the trigger[,] and shot [Jorge] multiple times." *Id.* at 780; *see also Ex parte Chavez*, No. 02-24-00025-CR, 2024 WL 1207302, at *1 (Tex. App.—Fort Worth Mar. 21, 2024, no pet.) (mem. op., not designated for publication) ("[Adan] Chavez is accused of shooting and killing Jorge Gonzalez in a convenience store parking lot in October 2022, using a high-caliber, high-capacity, semi-automatic rifle.").

## II. Hearsay

Adan's first issue pertains to State's Exhibit 213, a minute-and-a-half long in-vehicle recording of David "Gordo" Munoz Jr.'s phone call to his mother. Adan contends the recording "contained hearsay." The State responds (1) that there was no abuse of discretion when Gordo, who had just witnessed a violent murder and was threatened with his own life immediately thereafter, testified that he was still in shock when he called his mother after these startling events and (2) that the recording was harmless when it was cumulative of Gordo's unchallenged trial testimony that Adan was the murderer and the overwhelming other evidence of Adan's guilt.

### A. Gordo's testimony prior to the hearsay objection

Gordo testified that he went to work at a car wash on the morning of October 1, 2022, and left work around 1 p.m., planning to get his 1998 pickup truck inspected. Before he could continue with his testimony, however, defense counsel asked the trial court to warn Gordo of his Fifth Amendment rights. Trial halted so that the trial court could appoint counsel for him. After conferring with counsel, Gordo opted to testify.

When trial resumed, Gordo testified that his truck had been a white Chevy, that he had a cooler and a spare tire in the truck bed that day, and that the truck's tags had expired and he was going to get them renewed that day. That afternoon, he picked up his cousin Adan and Jose "Trece" Gamboa at Adan's house and then drove them to the Dollar Saver in Northside to buy some drinks after Adan had an argument with

3

his "baby momma." Adan had a black bag with him and told Gordo that it contained clothing. Adan put the black bag in the cooler and got into the truck's back seat.

As Gordo drove the white truck into the Dollar Saver's parking lot, he saw Jorge drive by in his black Avalanche and then immediately return and park behind him. After Trece exited the front passenger seat and walked away, Adan pushed the back seat forward, got out, and walked to the back of the truck as Jorge approached.

In the rearview mirror, Gordo saw Adan pull a gun out of the black bag that had been in the cooler. He heard three or four loud shots but did not actually see Adan shoot Jorge. He said that Adan then wiped blood from the gun, threatened to kill him and his mother if he did not drive Adan away from the scene, and got into the passenger seat. Gordo dropped Adan off in a nearby alley and then returned to the crime scene. He stated that he had not known before the shooting that Adan had a gun and that he had been shocked at what had happened.

During Gordo's testimony, the prosecutor approached the bench and advised the trial court that the State had a video in which Gordo "calls his mother in the back of the police car. He is screaming, high emotion." She characterized the recording as meeting both the present-sense-impression and excited-utterance hearsay exceptions. The trial court gave the jury a brief recess to allow defense counsel to view the video and to make objections.

After viewing the video, defense counsel objected, stating,

4

I don't think he's excited. It's after the shooting. He's yelling at his mom because, seemingly, he can't see her. . . . [H]is hands are handcuffed behind him and he pulls his phone out of his pocket and . . . he yells at her because she's asking the same question. He doesn't seem excited, nervous or anything like that *to the defense*, so we would object to it coming in. [Emphasis added.]

The prosecutor responded that it was a present sense impression because "he is describing an event that has just occurred. He's just been detained to give a witness statement while he's on the scene . . . [a]nd it's immediately after he witnessed what had happened . . . ." The prosecutor pointed out that Gordo had already testified that he had been shocked by the event and argued, "[Y]ou can clearly see the high emotions in the video itself, Your Honor, as he's trying to get his mother to arrive to see because he's very concerned." The trial court overruled the defense's objection.

Resuming his testimony before the video's publication, Gordo stated that he did not recall whether the police were already there when he returned to the scene, but he said that they quickly detained him and put him in the back of a patrol car. He called his mother from there because he was in shock and "to see what to do."

Defense counsel then reurged his objection, stating, "From the testimony that he just gave that he wasn't sure when the police were there, I'm going to say that it wasn't immediately necessary, so it wasn't present sense." The trial court overruled the objection and allowed the recording's publication.

## B. The recording

Gordo, who was handcuffed, told his phone, "Call Mom." When his mother answered, Gordo announced without greeting, "Mom, come to Northside. They think I shot somebody." When his mother responded that she could not hear him, Gordo shouted, "Come to Northside! Cuz they think I shot somebody!" His mother replied, "They think you saw somebody?" Gordo responded, "They shot somebody! F---ing Adan . . . stupid ass." His mother replied, "Who shot somebody?" Gordo then shouted, "Adan!"

Gordo's mother then asked, "What [sic] did he shoot him?" Gordo replied, "He shot this person that told him . . . Well hurry up. Come to the . . . where you at?" His mother replied that she was taking someone for a haircut. Gordo replied, "Ok, well, if anything, I'll probably go to jail." His mother responded, "No, you're not going to jail. You're going to go home." Gordo then shouted, "I'm going to jail! I'm back in the cop car, I'm telling you." His mother asked, "Why?" Gordo again shouted, "I'm telling you. That's what I'm saying!" His mother then asked, "Why are you going to jail? What did you . . . I thought you were at work." Gordo stated, "I was. They let me go early." His mother replied, "What?" Gordo repeated, "They let me go early."

After a pause, his mother then asked, "Why are you in the back of the cop car?" Gordo replied, "I don't know." When she asked where he was, he shouted, "In Northside!" In a different, sterner tone, his mother asked, "What [are] you doing in

6

Northside?"  Gordo responded, "I'm trying to freaking get the plates to the truck."[3]

In the same tone, his mother replied, "No, you don't need to get the plates to the

truck.  You need to bring your ass home."  Gordo replied, "Well I'm telling you I'm

gonna probably go to jail.  These damn people.  Alright, bye."

## C.  Standard of review and applicable law

Hearsay is an out-of-court statement offered to prove the truth of the matter

asserted therein.  Tex. R. Evid. 801(d).  We review a trial court's decision to admit

hearsay for an abuse of discretion.  *Elsik v. State*, 714 S.W.3d 27, 34 (Tex. Crim. App.

2024).  An abuse of discretion occurs if the trial court's decision lies outside of the

zone of reasonable disagreement.  *Id.*  We may not substitute our own decision for

that of the trial court, and as long as the ruling is within the zone of reasonable

disagreement, we will not intercede.  *State v. Heath*, 696 S.W.3d 677, 689 (Tex. Crim.

App. 2024).  Further, we will uphold an evidentiary ruling if it was correct on any

theory of law applicable to the case.  *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim.

App. 2016).

Hearsay is not admissible unless a statute, the rules of evidence, or other rules

prescribed under statutory authority provide otherwise.  Tex. R. Evid. 802; *Elsik*, 714

S.W.3d at 37 ("Hearsay is inadmissible unless it falls within an exception.").  One of

the exceptions that allows hearsay's admission is "present sense impression," which is

---

[3]Photos of Gordo's truck showed that it had paper tags that had badly deteriorated.

a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Tex. R. Evid. 803(1). Another is "excited utterance," which is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Tex. R. Evid. 803(2).

The present-sense-impression exception has relatively strict requirements because it is a statement "made while the declarant is perceiving an event, or immediately thereafter, that *describes* or *explains* the event that prompted the statement." *Green v. State*, 713 S.W.3d 865, 883 (Tex. Crim. App. 2025), *cert. denied*, No. 25-5750, 2026 WL 490513 (2026). The excited-utterance exception, on the other hand, is broader in that the declarant's statement, made while he or she is experiencing the excitement caused by an event, "need only *relate* to the event." *Id.* The excited-utterance exception applies if: (1) the statement is the product of an exciting or startling event that creates an emotional reaction in the declarant that renders the utterance spontaneous; (2) the emotion caused by the event is still dominating the declarant's mind so as to avoid the possibility of fabrication; and (3) the statement sufficiently relates to the circumstances of the event to ensure reliability and trustworthiness. *Id.* at 882.

## D. Analysis

Adan argues that the trial court abused its discretion by admitting the exhibit under either the present-sense-impression exception or the excited-utterance

8

exception.  However, the record reflects that even if the trial court abused its discretion by admitting the evidence under the present-sense-impression exception, its decision was within the zone of reasonable disagreement as to whether the excited-utterance exception applied to the recording.  *See Henley*, 493 S.W.3d at 93 (stating that the reviewing court will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case).

Although Adan contends that Gordo was "no longer under the excited conditions set by the shooting" and instead was "trying to speak loud enough for his mother to hear him as he is handcuffed, and the phone is not up to his face,"  the trial court was in the best position to gauge Gordo's state of mind based on both Gordo's testimony about having been in shock and then upon viewing the recording.  Because reasonable minds could disagree about the excited-utterance exception's applicability, we conclude that there was no abuse of discretion and overrule Adan's first issue.

### III.  Jury Charge

In his second issue, Adan complains that he suffered egregious harm when the trial court failed to sua sponte charge the jury with an accomplice–witness instruction. He asserts that Gordo's involvement rose to the level of an accomplice-as-a-matter-of-fact based on conflicting or inconclusive evidence about why Gordo drove Adan to or from the Dollar Saver.

The State responds that an accomplice–witness instruction was neither required nor appropriate because the record contains no evidence showing that Gordo

9

participated in or promoted Adan's murder of Jorge with the required mental state. The State also asserts that any error in omitting the unrequested instruction caused no egregious harm when ample non-accomplice evidence overwhelmingly connected Adan to the murder.

## A. Standard of review and applicable law

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. art. 36.19; *see also Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (stating that *Almanza* is the proper standard of review for unobjected-to charge error).

The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the

10

defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174; *see Medina v. State*, 7 S.W.3d 633, 642–43 (Tex. Crim. App. 1999) (applying *Almanza* analysis to failure to give a requested accomplice–witness instruction and concluding that it was harmless "[g]iven the substantial amount of non-accomplice evidence connecting appellant to the crime[] and the tenuousness of evidence that [the witness] was an accomplice").

A conviction cannot be secured upon an accomplice's testimony unless corroborated by other evidence tending to connect the defendant to the offense. *See* Tex. Code Crim. Proc. art. 38.14. An accomplice is an individual who participates in the crime with the defendant—through an affirmative act—before, during, or after the crime's commission *and* with the requisite culpable mental state. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). An individual is clearly an accomplice if he, like the defendant, could be prosecuted for the offense or a lesser-included offense. *Id.* There must exist evidence sufficient to connect the alleged accomplice to the criminal offense as a "blameworthy participant," but whether the alleged accomplice–witness is actually charged or prosecuted for his participation is irrelevant. *Id.*; *see Medina*, 7 S.W.3d at 641 ("The defendant is entitled to an accomplice–witness instruction *if and only if* []there is sufficient evidence in the record to support a charge against the witness alleged to be an accomplice.[]" (emphasis added)).

11

A witness may be an accomplice either as a matter of law or as a matter of fact, and the case's evidence determines what jury instruction, if any, needs to be given.[4] *Cocke*, 201 S.W.3d at 747. If the parties present conflicting or unclear evidence as to whether a witness is an accomplice, the jury should first determine whether the witness is an accomplice as a matter of fact. *Id.* at 748. But when the evidence clearly shows that a witness is not an accomplice, the trial court is not obliged to instruct the jury on the accomplice–witness rule. *Smith v. State*, 332 S.W.3d 425, 440 (Tex. Crim. App. 2011); *see Druery v. State*, 225 S.W.3d 491, 500 (Tex. Crim. App. 2007) ("[W]e have previously held that merely assisting after the fact in the disposal of a body does not transform a witness into an accomplice witness in a prosecution for murder."); *Kunkle v. State*, 771 S.W.2d 435, 441 (Tex. Crim. App. 1986) (holding defendant failed to raise a fact issue as to whether witness was an accomplice in the absence of "some evidence showing [his] complicity [in the] commission of the murder"). That is, an accomplice must have engaged in an affirmative act "that promotes the commission of the offense that the accused committed." *Smith*, 332 S.W.3d at 439. Here, that is Jorge's murder.

---

[4]A defendant has a right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the evidence's credibility. *Cocke*, 201 S.W.3d at 747.

## B. Analysis

There is no evidence in this record to show that Gordo took any affirmative act to intentionally or knowingly cause Jorge's death, *cf.* Tex. Penal Code § 19.02(b)(1); *Cocke*, 201 S.W.3d at 748, or that he had any criminal responsibility for Adan's having shot Jorge multiple times before Adan ordered Gordo to drive him from the scene, *cf.* Tex. Penal Code § 7.02(a)(2) (describing a person as criminally responsible for another's offense if, acting with the intent to promote or assist in the offense's commission, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense). *Compare Walter v. State*, 293 S.W.3d 886, 895 n.8 (Tex. App.—Texarkana 2009, pet. ref'd) (stating that as to imposing criminal responsibility for an offense under Section 7.02, "[s]tanding alone, proof that an accused was present at the scene of the crime or assisted the primary actor in making his or her getaway is insufficient"), *with Gulley v. State*, No. 01-24-00210-CR, 2026 WL 471753, at *1–4 (Tex. App.—Houston [1st Dist.] Feb. 19, 2026, pet. ref'd) (mem. op., not designated for publication) (affirming getaway driver's aggravated-robbery conviction when two non-accomplice witnesses opined, based on their law-enforcement experience and personal observations, that defendant had acted as the getaway driver in connection with his accomplice's armed robbery, corroborating accomplice's testimony that he and the defendant had agreed to rob someone, that the defendant drove him to the mall to do so, and that the defendant picked him up at the mall after the robbery), *and Crecy v. State*, No. 01-91-01065-CR, 1993 WL 21723, at *2 (Tex. App.—Houston [1st

13

Dist.] Feb. 4, 1993, no pet.) (mem. op., not designated for publication) (concluding that witness was an accomplice to murder as a matter of law when she drove the killer to the scene and encouraged him during the crime's commission, stating, "shoot him, kill him," and pointing a gun at those at the scene).

During the State's case in chief, in cross-examining the investigating detective assigned to the case, defense counsel asked if Gordo had admitted in his interview that he had driven Adan from the scene. The detective said "yes" to that question and "yes," in response to the follow-up question, "And your understanding of criminal law, *could* that make him an accomplice?" [Emphasis added.] On redirect examination, however, the detective testified that based on Gordo's having told him Adan had threatened him with the firearm if he did not drive him away, Gordo had not committed an offense by driving away. Rather, Adan had possibly committed aggravated assault or kidnapping by making the threat.

Even assuming that the trial court erred, however, as set out below, the record does not reflect egregious harm. *See State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) (explaining that under the egregious-harm standard, omitting an accomplice–witness instruction is generally harmless unless the corroborating, non-accomplice evidence is so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive).

14

### 1. Voir dire and opening statements

No one raised the possibility of accomplice testimony or a witness's status as a potential accomplice during voir dire or opening statements. During voir dire, the prosecutor focused on the requisite mens rea (intent and knowledge), the burden of proof, the presumption of innocence, the right to remain silent, the punishment range, and how to determine witness credibility. The defense likewise focused on these items.

In opening, the prosecutor stated that she expected the evidence to show escalation on the day of the murder from a fight between Jorge and Adan that morning to the shooting up of Jorge's house later with the same gun that Adan then used to murder Jorge in the Dollar Saver's parking lot. The prosecutor briefly mentioned Gordo as someone who would testify about the shooting and referenced Adan's demand that Gordo drive him from the murder scene before Gordo returned to the scene to give his statement. She then described the evidence that led to the murder weapon's discovery and to finding Adan days later.

The defense advised the jury to remain skeptical, impugned the police investigation, and asked the jury to keep track of the inconsistencies in testimony and the lack of evidence to affirmatively tie Adan to the weapon.

### 2. Remaining guilt–innocence evidence

In addition to the individuals who knew the deceased and the accused, current and retired police officers from the Wichita Falls Police Department and other

15

experts testified about the murder investigation and the events before and after it that led to Adan's arrest. We have summarized the remaining evidence below.

Adan, Trece, and the Gonzalezes (Jorge and his younger brothers Raul and Frankie) had worked together as roofers, and the Gonzalezes lived near Trece's home on 8th Street. Adan and Raul had exchanged text messages on the day before Jorge's death. Raul read the text messages, which were in Spanish, into the record via a translator.

In the messages, Adan demanded repayment of $1,000 that Raul had borrowed from him months before,[5] and Raul told him to "charge [him] face to face . . . like [a] man instead of sending [him] messages." Adan told him, "I can put a f---ing bullet in your head . . . [a]nd I don't give a f---." Raul replied that he would fight him hand to hand "like a man" and that "pistols are only for assholes like you." Adan told him that he was going to bring ten of his friends, to which Raul replied, "You are an asshole if you need ten idiots to help you. You and I by ourselves can [fight] like real men. . . . If you want, we can kill each other . . . just by fighting, just you and me by ourselves."

The next day—October 1, 2022—at around 9 a.m., Adan and Jorge engaged in a fist fight, which had been recorded by Trece's home-surveillance equipment and was shown to the jury. The fight began between Adan and Raul and expanded to include

_____

[5]Raul had not repaid any of the money before Jorge was killed.

others. As the fight ended, Adan gestured and said something to the Gonzalezes.[6] Jorge got back out of his vehicle and came back at Adan, striking him in the face, knocking him down, and setting off another melee that included the surrounding men.

Jorge called his girlfriend Maria Mendoza[7] to tell her about the fight, and she went to his house and called the police because she spoke English better than the Gonzalez brothers. Maria, who had been three months' pregnant with Jorge's child at the time, stated that the police told her to let them handle it, so she went home, and the Gonzalezes went to work.

Around mid-morning, Sergeant Brian Masterson spoke with Raul. Raul told him about some issues with a neighbor that "got kind of crossways" and involved the revving of a truck's engine. Sergeant Masterson also spoke with a heavyset Hispanic man in a red shirt[8] near a white pickup truck with no tags.

At around 10:38 a.m., someone reported shots fired in the area near Jorge's house, and Sergeant Masterson responded to the call. Sergeant Masterson saw "the

---

[6]The video had no audio. According to Trece, when Adan continued to walk towards Jorge in the video, Adan "was just telling them to leave him alone." Trece also testified that he and Adan had been under the influence of pills, alcohol, and marijuana that morning and that everyone in the fight had been "under the influence." Later that day, before the murder, he, Gordo, and Adan had smoked marijuana.

[7]Maria and Adan's girlfriend Lizbeth Mendoza are cousins.

[8]State's Exhibit 213 shows that Gordo met this physical description and was wearing a red shirt that day. Raul testified that "Gordo" is Spanish for "Fat," and Maria's aunt Jennifer Ortiz described Gordo as "the fat boy."

17

white pickup that had been previously across the street from [his] original call there on North 8th [Street]" and an orange Charger that belonged to Adan's girlfriend Lizbeth.

When Jorge and his brothers came home for lunch that day, they called the police to report that their house had been shot up. Jorge also called Maria around that time to tell her about it. When she went inside his house, she saw "bullets from the front to the back," with a lot of damage and broken furniture. Maria translated for the Gonzalezes when the police responded. Sergeant Masterson found eleven cartridge casings that were later identified as fired from the same rifle that killed Jorge. Both Sergeant Masterson and Maria testified that they saw Lizbeth's orange Charger when it drove by the residence while the police took the Gonzalezes' report.[9]

After reporting the incident to the police, Jorge and his brothers decided to stay with Maria at her apartment. Maria stated that Jorge had been very angry "about his house being shot up and his things being destroyed."

Maria, her aunt Jennifer, and Jorge's brothers left together, and Jorge followed them in his black Avalanche. They stopped at the Dollar Saver, a busy neighborhood convenience store with a lot of vehicle and pedestrian traffic, so that Jorge could put gas in the Avalanche. As shown on the store's internal surveillance video, Jorge also went into the store and purchased a bottle of beer.

---

[9]Maria testified that she told the police about having seen her cousin's orange Charger during this report but that they "didn't even bother doing anything," and just told her and the Gonzalezes to get the clothing they needed and to leave.

18

Maria and her passengers left the Dollar Saver first, with Jorge following them. In her rearview mirror, Maria saw Jorge slow down and "the white truck coming fast after him." Maria saw Adan,[10] Trece, and "the boy in the red shirt" in that truck. Jorge made a quick U-turn and returned to the Dollar Saver, but—as the vehicle in the lead—Maria had to take the longer loop.

By the time Maria made it back to the Dollar Saver, at around 4:51 p.m., Jorge had been shot multiple times; he died in the parking lot next to the Avalanche.[11] She saw Trece and Gordo there and stated that "[t]hey were just in shock, didn't know what to do, just watching [Jorge] laying there bleeding." Neither Maria nor Raul saw Adan at the scene. *See Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) ("Flight is circumstantial evidence from which a jury may infer guilt.").

Maria called 911, and Gordo and Trece stayed on the scene until the police took them away. At the scene, Maria and her aunt identified Adan as the suspect, as

---

[10]Maria described Adan that day as having had his hair "messed up and poofy" in white rubber bands. The jury could have concluded that the video of the fight that morning supported this description.

[11]The medical examiner testified that Jorge died from eight gunshot wounds, some of which had gunpowder stippling and soot deposition, implying that the gun had been somewhat at close range.

did Gordo and Trece that day during interviews at the police station.[12]  Raul testified that he did not believe that Jorge had ever had any problems with Trece or Gordo and that Trece told him at the scene that Adan had shot Jorge.

Trece testified that Adan had shot Jorge.  He stated that he had been friends with both Adan and the Gonzalezes, so after the shooting, he had "just stayed in shock looking at [Jorge]."  He stated that Adan always carried a gun and that he had told the investigating detective that Adan had told Jorge that he "wasn't going to fight him [but that] he was just going to shoot him."

Police found a cluster of cartridge casings from an assault rifle and some live rounds near Jorge's body, and inside the Avalanche, police found Jorge's recently purchased, still-unopened bottle of beer but no weapons of any kind.  After the murder weapon was later found at a home occupied by Adan's cousin,[13] police

---

[12]Maria testified that at the time, she had believed Adan shot Jorge because "[Adan] wasn't there.  His own friends said that he shot him and he run."  *See Kirk*, 421 S.W.3d at 781.  She did not see Trece or Gordo with a firearm at the scene.

[13]Adan's cousin Mister Williams, a five-time convicted felon, and Mister's wife Kayla Williams both had outstanding warrants for violent crimes, and police found the murder weapon during SWAT's October 6, 2022 execution of a search warrant at their home, where Adan was rumored to have been.  The Williamses testified that Adan had been at their home before the search warrant's execution, and Kayla stated that he had been there between the hours of 9 p.m. and 5 a.m.  Kayla testified that she did not know Gordo or Trece, knew nothing about the firearm recovered during the search warrant's execution, and had not seen a gun in Adan's possession at her house.  During the defense's case, Mister testified that Adan had not brought a gun with him to their house, and he identified a different cousin with no relation to Adan—Giovanni Melendez—as having done so four or five days before.  On cross-examination, the prosecutor asked, "So you didn't see [the gun], you didn't see

20

discovered that the cartridge casings and bullets at the murder scene had been fired from the same rifle that had been used to shoot up Jorge's house earlier that day.[14] Adan's phone location data put him in the area of the shooting of the Gonzalezes' house and of the murder at the time of these offenses.

Adan was located and arrested three weeks later. After his arrest, he called his mother from jail. The recorded call was published to the jury as rebuttal evidence following the defense's case. In the call, Adan complained to his mother that there had also been a driver, stating, "[I]t wasn't just me," and "If there's no video, they can't say it was me."

### 3. Guilt–innocence charge

The guilt–innocence charge instructed the jury about the presumption of innocence and the privilege against self-incrimination, the State's burden of proof, and the offense's elements, as well as the jury's responsibility to judge the witnesses' credibility and the weight to be given their testimony. The jury was instructed that they could only consider extraneous-offense evidence if they found beyond a reasonable doubt that Adan had committed the acts and only for the purpose of

---

[Giovanni Melendez] put it anywhere, but you remember it was four or five days before?" Mister replied, "Yes, ma'am." No other evidence indicated a connection between Melendez and the murder.

[14]Sergeant Masterson testified that he was turning in the evidence from the shooting-up of the Gonzalezes' home when he heard the call about the murder. Four more live rounds matching the cartridges were found in the white truck at the crime scene.

showing his motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident, or state of mind, if any. Adan did not request an accomplice–witness instruction or object to its omission.

### 4. Guilt–innocence closing arguments

The prosecutor argued that Adan had intentionally and knowingly caused Jorge's death by shooting him eight times out of thirteen shots and referred the jury not only to Gordo's statement but also to Maria's testimony; to Trece's identification of Adan as the shooter and his recounting to Detective Killingsworth that Adan had told Jorge, "I'm not going to fight you, I'm just going to shoot you"; to Adan's threatening text messages the day before the murder; and to the physical evidence linking Adan to the murder weapon, which was found in his cousin's house.

The defense argued that there were discrepancies in the State's case, that the police had not done a good enough job investigating, that it would have been impossible for Maria to have seen Adan in the white truck from her rearview mirror, and that Trece and Gordo could not be trusted.

In the State's rebuttal, the prosecutor pointed out the escalation of behavior during less than twenty-four hours and that everyone—not just Gordo—had identified Adan as the shooter. She also argued that Adan's jail call clarified his guilt.

## C. Conclusion

Adan acknowledges that the omission of an accomplice–witness instruction "is generally harmless unless the corroborating evidence is so unconvincing in fact as to

render the State's overall case for conviction clearly and significantly less persuasive." However, he asserts that Trece's testimony—as the "only . . . other non-accomplice witness who testified that [he] was the shooter"—was not believable or reliable based on Trece's admitted drug use at the time of the shooting. He contends, "This case lacks that strong corroborative evidence that goes to an element of the offense, namely, the individual who shot Jorge Gonzalez, the deceased," causing him to be egregiously harmed by the exclusion of an accomplice–witness instruction. We disagree.

The jury was entitled to believe Maria's testimony and to find credible Trece's testimony that Adan was the shooter, particularly in light of the physical evidence. That evidence illustrated Adan's state of mind through the text messages and the video of the morning fight. The bullet casings connected the weapon used in more than one offense against Jorge that day. And the weapon's post-murder location was connected to Adan through his cousin. The jury could also have considered Adan's failure to remain at or return to the scene, unlike Trece and Gordo, and how long he remained at large. *See id.*

Viewing the guilt–innocence record as a whole, we see no indication of egregious harm that would require reversing Adan's conviction. Accordingly, we overrule his second issue.

## IV.  Conclusion

Having overruled both of Adan's issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 25, 2026